NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| W.M. and K.M., Individually and as Guardians ad litem of S.M., | |
| Plaintiffs, | Civ. No. 05-4022 (AET) |
| | **MEMORANDUM OPINION** |
| v. | |
| SOUTHERN REGIONAL BOARD OF EDUCATION, | |
| Defendant. | |
| SOUTHERN REGIONAL BOARD OF EDUCATION, | |
| Plaintiff, | Civ. No. 05-4127 (AET) (consolidated with Civ. No. 05-4022) |
| v. | |
| W.M. and K.M., on behalf of S.M., | |
| Defendants. | |

THOMPSON, U.S.D.J

I.  Introduction

This matter is before the Court on the parties' cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56(c). The Court has jurisdiction over this matter under 20 U.S.C. § 1415(i)(2). The Court has made its determination after considering the written submissions of the parties. Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. For the reasons set forth

below, Defendant's motion is granted in part and denied in part, and Plaintiffs' motion is denied.

II.     Background

S.M. is a seventeen year old male who is classified as eligible for special education and related services based upon the category of "auditorily impaired." S.M. is currently enrolled at Southern Regional High School, which is operated by Defendant Southern Regional Board of Education ("Southern" or "Defendant"), and was in tenth grade during the 2005-2006 school year. When he was approximately 3 years old, S.M. was diagnosed with severe to profound bilateral sensory neural hearing loss of congenital onset. The record indicates that S.M. was born prematurely, stopped breathing at birth, and experienced a host of post-natal complications that required medical treatment and multiple hospitalizations. (Exs. R-12, R-14, P-26.) S.M. has been receiving special education since he was diagnosed with hearing loss. His primary language is American Sign Language ("ASL"). S.M. has been educated in a mainstream placement since the third grade. In his current placement, S.M. is accompanied by a certified Teacher of the Deaf to his academic classes, and is accompanied by a qualified interpreter for the deaf for the remainder of his school day. (Ex. R-39.)

At the end of S.M.'s eighth grade year, Southern's Child Study Team ("CST") proposed an Individualized Education Program ("IEP") for the 2004-2005 school year that recommended "an out-of-district program for students with Auditory Impairment" to meet S.M.'s "academic and social emotional needs." (Ex. R-30 at 8.) In developing the proposed IEP, Southern hired experts in the field of deaf education to conduct independent evaluations of S.M. These experts sought to conduct neurological evaluations of S.M., but could not get approval from S.M.'s parents to do so. Following the advice of its experts, Southern explored the option of placing

S.M. in a school for the deaf. In particular, Southern proposed to send S.M. to the Marie S. Katzenbach School for the Deaf ("Katzenbach"), located in Ewing Township, New Jersey.

Plaintiffs W.M. and K.M., S.M.'s parents, did not agree because they believed that S.M. was making appropriate progress and had been able to integrate well in the mainstream environment. Because Plaintiffs and Southern could not agree on an IEP, an interim IEP was developed for the 2004-2005 school year that continued S.M.'s mainstream placement at Southern. (Ex. R-39.)

The parties filed cross-petitions for Due Process over the issue of whether S.M. should remain mainstreamed at Southern, or whether he should be placed at Katzenbach. The petitions were transmitted to the Office of Administrative Law on May 28, 2004. After ten days of hearings, held between August 11, 2004 and June 13, 2005, the Administrative Law Judge ("ALJ") dismissed Defendant's Due Process petition without prejudice in a written opinion on July 28, 2005.

The ALJ determined that both the petitions of Plaintiffs and Defendant incorrectly presumed that S.M.'s only eligibility category for special education was "auditorily impaired." The ALJ opined that if S.M's only disability was his deafness, then the conclusion in the matter would be "uncomplicated," with Southern's petition for relief being granted. The ALJ based the bulk of his analysis on the testimony of Dr. Edna Barenbaum, an independent medical examiner hired by Plaintiffs. Dr. Barenbaum diagnosed S.M. as having learning disabilities based on a comparison of his abilities and his scores measured against other auditorily impaired students, and also on S.M.'s health problems at birth. The ALJ noted that the diagnosis of learning disabilities was further supported by the testimony of Cari Katz and Pamela Balkovec, who

testified as experts for Southern.  Consequently, the ALJ found as a fact that S.M. suffers from learning disabilities apart from his hearing impairment, and thus is "multiply disabled" as defined by N.J. Admin. Code § 6A:14-3.5(c).

The ALJ ordered Southern to develop a new IEP to address S.M.'s learning disabilities, and that S.M.'s IEP be revised to include recommendations made by Dr. Barenbaum.  He also ordered an independent neurological examination of S.M. to aid in developing the new IEP.  S.M. remained placed at Southern as the "apparent least restrictive educational environment."  The ALJ, however, indicated that if Southern could not provide a free appropriate public education to S.M. under the new IEP, then placement at Katzenbach or another special education school would remain a viable alternative through a subsequent Due Process petition.

Plaintiffs, on behalf of S.M., filed this action on August 12, 2005, seeking attorneys' fees and related costs as the prevailing party in their Due Process petition before the ALJ.  Defendant filed a separate action against Plaintiffs on August 22, 2005, seeking a reversal of the ALJ's decision denying its request to place S.M. at Katzenbach.  The two actions were consolidated pursuant to a consent order on September 27, 2005.  The parties subsequently filed their cross-motions for summary judgment.

III.     Review of an ALJ's Decision Under the Individuals with Disabilities Education Act

    A.     Standard of Review

In an action brought to appeal an ALJ's decision under the Individuals with Disabilities Education Act (the "IDEA," or the "Act"), the district court applies a "modified version of de novo review." L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 (3d Cir. 2006).  The district court "must make its own findings by a preponderance of evidence . . . and must also afford 'due

weight' to the ALJ's determination." Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198-99 (3d Cir. 2004) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982)) (citations omitted); see also 20 U.S.C. § 1415(i)(2)(C) ("[T]he [district] court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."). The ALJ's findings of fact from the administrative proceedings are "considered prima facie correct." Shore Reg'l, 381 F.3d at 199. If the district court disagrees with the ALJ's findings, it must explain why by "point[ing] to contrary nontestimonial extrinsic evidence on the record." S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 270 (3d Cir. 2003). However, when the district court hears additional evidence, it is "free to accept or reject the agency findings" based on the "new, expanded record." Id. The district court is not to "substitute [its] own notions of sound educational policy for those of the school authorities." Rowley, 458 U.S. at 206.

    B.    The Individuals with Disabilities Education Act

Under the Act, Congress granted federal funding to the states for special education programs, contingent on the states providing a "free appropriate public education" to disabled children. 20 U.S.C. § 1400(d)(1)(A). At the Act's core is the requirement that an IEP be designed for each child. 20 U.S.C. § 1414(d); S.H., 336 F.3d at 264. The IEP sets forth the goals and objectives which will be used to determine whether the child is receiving a free appropriate public education. 20 U.S.C. § 1414(d); S.H., 336 F.3d at 264. The IEP is developed by a team composed of the child's parents, the child's regular and special education teachers, a curriculum specialist from the school district, and in addition, if requested by the parents or the school,

anyone with special knowledge or expertise related to the child's education.  20 U.S.C. § 1414(d)(1)(B); S.H., 336 F.3d at 264.  In New Jersey, the IEP is developed by a CST, composed of a school psychologist, a learning disabilities teacher-consultant, and a school social worker, along with the child's parents, a teacher familiar with the child, and other appropriate school personnel.  N.J. Admin. Code § 6A:14-2.3; S.H., 336 F.3d at 264-65.  The IEP is reviewed at least annually to determine whether the child is reaching the stated goals, and is revised as necessary.  20 U.S.C. § 1414(d)(4); S.H., 336 F.3d at 265.  The burden of proof in a proceeding to challenge an IEP is placed upon the party seeking relief.  Ramsey, 435 F.3d at 391-92 (citing Schaffer v. Weast, 126 S. Ct. 528 (2005)).

       1.     Free Appropriate Public Education

In Rowley, the Supreme Court considered the meaning of the phrase "free appropriate public education."  Rowley, 458 U.S. at 201-03.  It held that a state can satisfy the requirement of a "free appropriate public education" when a state provides "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  Id. at 203.  The state must offer access to education that is "meaningful," Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999), but does not need to offer education that "maximize[s] each child's potential," Rowley, 458 U.S. at 198.  The Third Circuit has further interpreted the phrase "free appropriate public education" as "call[ing] for more than a trivial educational benefit" and requiring an IEP to provide "significant learning" and to confer a "meaningful benefit."  Ridgewood, 172 F.3d at 247 (quoting Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 182-84 (3d Cir. 1988)).  The court determines whether the benefit is meaningful in relation to the child's individual potential.  Id.  Thus, if the child "display[s] considerable

intellectual potential, [the Act] requires 'a great deal more than a negligible [benefit].'" Id. (quoting Polk, 853 F.2d at 182).

### 2. Least Restrictive Environment

The Act also requires that children with disabilities be educated in "the least restrictive environment." 20 U.S.C. § 1412(a)(5). This requirement outlines the Act's strong preference for mainstreaming disabled children, and provides that

> [t]o the maximum extent appropriate, children with disabilities . . . are [to be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should] occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Id.; see Oberti v. Bd. of Educ., 995 F.2d 1204, 1214 (3d Cir. 1993) (citations omitted). The Third Circuit has recognized the inherent tension in the Act between the preference for mainstreaming and the requirement of individualized education programs. Ramsey, 435 F.3d at 391. It has interpreted the "least restrictive environment" provision as "mandating education 'in the least restrictive environment that will provide . . . a meaningful educational benefit.'" S.H., 336 F.3d at 265 (quoting T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 578 (3d Cir. 2000)). The focus of the court's analysis is the "school's proper use of 'supplementary aids and services,' which may enable the school to educate a child with disabilities for a majority of the time within a regular classroom, while at the same time addressing that child's unique educational needs." Ramsey, 435 F.3d at 391.

In Oberti, the Third Circuit adopted a two-part test to determine whether the "least restrictive environment" requirement is met. Oberti, 995 F.2d at 1215. First, the reviewing court

must determine "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." Kingwood Twp., 205 F.3d at 579.  The court should consider: "(1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom." Ramsey, 435 F.3d at 390 (quoting Kingwood Twp., 205 F.3d at 579).  Second, if the court finds "that placement outside of a regular classroom is necessary for the child's educational benefit," then it must determine whether the school has made efforts to mainstream the child whenever possible. Kingwood Twp., 205 F.3d at 579.

    C.    Analysis

Where no new evidence has been presented to the Court, a motion for summary judgment in an IDEA case is the procedural vehicle for asking the judge to decide the case based on the administrative record.  M.A. v. Voorhees Twp. Bd. of Educ., 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (quoting Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997)).  Accordingly, in making its determination in this case, the Court has considered the lengthy record, and the volumes of transcripts from the administrative hearing.  To assess whether Southern has complied with the requirements of the Act, the Court will consider two intertwined issues:  (1) whether Southern's proposed IEP provides S.M. with a free appropriate public education, and (2) whether S.M. is being educated in the least restrictive environment.

For an IEP to provide a free appropriate public education, it must offer "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to 'benefit' from the instruction." Susan N. v.

Wilson Sch. Dist., 70 F.3d 751, 756 (3d Cir. 1995) (quoting W.B. v. Matula, 67 F.3d 484, 491 (3d Cir. 1995)). In this case, the ALJ concluded that Southern was required to revise S.M.'s IEP to account for S.M.'s learning disabilities. The record supports this conclusion. Indeed, several witnesses testified about S.M.'s distractibility and short attention span. In addition, Ms. Katz and Ms. Balkovec, both expert witnesses for Southern, testified that S.M. probably suffered from neurological problems that affected his learning, but noted that a neurological exam was needed before a definitive conclusion could be made. Furthermore, Dr. Barenbaum, an expert for Plaintiffs, evaluated S.M. and found evidence of learning disabilities.

In its brief, Southern notes its disagreement with the ALJ's decision to change S.M.'s classification from "auditorily impaired" to "multiply disabled," and contends that the ALJ lacks the authority to make such a change. (Def.'s Br. in Supp. at 36.) Although the CST determines the eligibility classification for a disabled student, a party may challenge this classification through a due process hearing in front of an ALJ. N.J. Admin. Code §§ 6A:14-2.7, -3.5(a). Based on the evidence in the record, the Court will affirm the ALJ's classification and his conclusion that S.M.'s IEP should be revisited to address learning disabilities. Thus, in developing S.M.'s IEP following this ruling, the CST must consider the neurological evaluation ordered by the ALJ, and must address those of S.M.'s learning problems that are not due to his hearing impairment.

The paramount dispute in this case, however, does not involve the revision of the IEP to address S.M.'s learning disabilities. Rather, the parties are particularly concerned with the issue of placement, which hinges on the least restrictive environment analysis. The ALJ's treatment of this issue is somewhat problematic. On the one hand, he indicated that the issue of placement

could not be resolved until the IEP was revised, and that placement at Katzenbach was still "viable." On the other hand, he determined that Southern was the "apparent least restrictive environment." The Court attributes this inconsistency to the complex nature of this case. Indeed, the facts of this case are made more difficult due to the nature of S.M.'s impairment, which prevents him from communicating easily with his non-disabled peers, and the desire of his parents to keep him in a mainstream educational environment. In the end, it appears to the Court that the ALJ did not engage in an adequate analysis of the "least restrictive environment" requirement. Under the modified de novo standard of review applicable in this case, the Court will make its own findings on this issue based upon the record. Ramsey, 435 F.3d at 389.

The Third Circuit has described the "least restrictive environment" as "one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." S.H., 336 F.3d at 265 (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995)). Clearly then, placement at Southern will be less restrictive than placement at Katzenbach unless S.M. cannot gain a satisfactory education at Southern with the use of supplementary services and aids. See Ramsey, 435 F.3d at 390.

Southern points to two reasons for S.M. to be placed at Katzenbach. First, Southern contends that S.M. needs to be totally immersed in ASL. Second, Southern asserts that S.M. has developed depression and anxiety due to his inability to communicate, and would benefit from placement at Katzenbach for social and emotional reasons. The Court will consider these arguments insomuch as they relate to whether S.M. can obtain a satisfactory education in a mainstream environment.

Currently, S.M. is mainstreamed for many of his academic classes. He receives accommodations and modifications for tests and assignments. S.M. does not have any behavior problems that would warrant an outside placement. To the contrary, S.M.'s first marking period report card for the ninth grade indicates that his teachers have found S.M. to be a "pleasure to have in class." (Ex. P-30.) That report card also indicates that S.M. has problems paying attention in class, and needs extra help in some subjects. (Ex. P-30.)

According to Barbara Palmieri, a Teacher of the Deaf at Southern, S.M. communicates using both ASL and pidgin, which is a combination of ASL and signed exact English, but cannot use either proficiently. In Ms. Palmieri's opinion, S.M.'s lack of fluency in ASL keeps him from understanding concepts in class. Ms. Katz, an educational expert, administered tests to determine S.M.'s abilities in different subjects. S.M. tested in the very low range in reading, broad written language, written expression, and broad math, and in the low range for overall mathematics calculation skills. Ms. Balkovec, an expert in the area of school psychology and deaf education, also conducted tests on S.M. Ms. Balkovec found that S.M.'s skills were "significantly less developed" than other children, and S.M. has a "low average" of 89 for his performance I.Q. S.M. was also evaluated by Dr. Barenbaum, who found that his non-verbal intelligence was average, but that his reading level was second grade. Barbara Roth, an independent speech and language specialist, tested S.M.'s vocabulary and language skills. Ms. Roth initially tested S.M. when he was in fifth grade, and found that S.M. was above average compared to other deaf students. Ms. Roth tested S.M. again when he was in eighth grade, and found that he was below average compared to other deaf students. (Ex. R-14.)

Plaintiffs contend that S.M. has been making progress in his current placement, as shown

by his grades.  Plaintiffs additionally note that Rick Gunsalus, Supervisor of Special Services for Southern, testified that the IEP team recommended placement at Katzenbach more for S.M.'s social and emotional health, rather than for academic reasons.  Plaintiffs also point out that Jennifer Raban, S.M.'s case manager in 2003-2004, testified that S.M. was making progress in the district.  In eighth grade, S.M. earned A's and B's for all his classes, and made the honor roll for the fourth marking period.  (Ex. P-1.)  His first marking period report card for the ninth grade shows that he has earned A's and B's in World History, Physical Education, and Math.  S.M., however, had a D in Science, a C in Power Mechanics, a C in English, and a failing grade in Woodwork.  (Ex. P-30.)

Previously, the burden of demonstrating compliance with IDEA was placed on the school district.  Oberti, 995 F.2d at 1219.  In the Ramsey case, however, the Third Circuit placed this burden on the party challenging the IEP pursuant to the Supreme Court's decision in Schaffer v. Weast, 126 S. Ct. 528 (2005).  See Ramsey, 435 F.3d at 391-92.  Accordingly, Plaintiffs now have the burden of proof.

Applying this burden of proof, the Court finds that S.M. cannot be satisfactorily educated at Southern Regional High School under the set of circumstances described above.  Although, in the past, S.M. has made progress, has earned passing marks, and has advanced from grade to grade, see Rowley, 458 U.S. at 203, these factors are outweighed by the evidence from the testimony and evaluations of the expert witnesses in this case showing S.M.'s currently stagnant, or perhaps even negative, progress.  The Court is persuaded by the testimony of Ms. Palmieri and Ms. Katz indicating that S.M.'s present lack of progress is due to Southern's inability to provide instruction in a mainstream classroom using immersive ASL.

The Court has examined the testimony of Dr. Barenbaum, Ms. Palmieri, and Ms. Katz to determine whether additional supplementary aids and services could help S.M. achieve a satisfactory education at Southern Regional High School.  The Court does not place great weight on Dr. Barenbaum's recommendations, as her specialty lies in the field of special education, rather than deaf education.  In addition, Ms. Palmieri's testimony on rebuttal reveals that Southern has already implemented several of Dr. Barenbaum's recommendations to a lesser degree, with negligible effect.  As a result, the Court finds that supplementary aids and services, even those that would be added to address learning disabilities, would not give S.M. a satisfactory education at Southern Regional High School.

Because the Court has determined that S.M. cannot be educated satisfactorily in the regular classroom with the use of supplementary aids and services, it will move on to the next part of the analysis:   whether Southern has made efforts to mainstream S.M. whenever possible. Kingwood Twp., 205 F.3d at 579.  The Court has already agreed with Southern's contention that S.M. requires instruction in an environment where ASL is the primary language.  Plaintiffs have not presented evidence of alternative programs that would allow a combination of education in a regular mainstream classroom as well as instruction in immersive ASL.  Therefore, the Court finds that S.M. can not be educated in a less restrictive placement than an educational facility such as Katzenbach.

Based on the analysis above, the ALJ's decision is affirmed in part and reversed in part, and Defendant's motion for summary judgment is granted in part and denied in part.

IV.     Award of Attorneys' Fees under the IDEA

     A.     Prevailing Party Status

Under IDEA, "the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B).  The test to determine if a party is a "prevailing party" is well established in the Third Circuit.  See, e.g., Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 593 (3d Cir. 2000). For a party to be eligible for attorneys' fees, a court must find that: (1) the party obtained relief on a significant claim in the litigation; and (2) there was a causal connection between the relief obtained and the litigation.  J.O. ex. rel. C.O v. Orange Twp. Bd. of Educ., 287 F.3d 267, 271 (3d Cir. 2002) (citing Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128, 131 (3d Cir. 1991)).

The primary relief sought by Plaintiffs concerned the issue of placement.  Because the Court has reversed the ALJ's decision on this issue, Plaintiffs are not prevailing parties. Therefore, attorneys' fees will not be awarded.

V.   Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part, and Plaintiff's cross-motion for summary judgment will be denied.  The accompanying order will be entered.

s/ Anne E. Thompson  
ANNE E. THOMPSON, U.S.D.J.

Dated: August 10, 2006